STATE OF MISSOURI, EX REL. L. B. BEACH, *v.* JOHN FINN.

### July 3, 1877.

1. The city of St. Louis, under the Constitution of 1875, though not a "county" in the sense in which that word is ordinarily used in the Constitution, is in a qualified sense a county being a "legal subdivision of the State" which bears county relations to the State, and having many important attributes of a county.

2. In a proceeding by *quo warranto* to try the title to the office of sheriff of the city of St. Louis, the question is not as to a *de facto* office or officer, but as to the *de jure* title to the office. In theory of law, the Scheme and Charter became the organic law of the city and county of St. Louis before the general election of November, 1876, and accordingly no such *de jure* office as sheriff of the (old) county of St. Louis existed at the time of that election. The commission issued, in consequence of an assumed

election, at that time, to a candidate for that supposed office, did not avail to give more than color of title.

8. At the general election in November, 1876, no votes were cast for sheriff of the new county called the "City of St. Louis." Afterwards, that city having been organized, and being "a county" * * * "hereafter established," within the meaning of the last clause of section 10 of article 9 of the Constitution, it became the duty of the governor to appoint a sheriff. *Held*, that the respondent, being possessed of the necessary qualifications, was properly appointed and was entitled to the office.

APPLICATION for *quo warranto*.

*Judgment for respondent.*

C. C. SIMMONS, for relator : The city of St. Louis is not a county. — *The State* v. *Merriman*, 6 Wis. 14. Where a county is divided, that portion in which a county government is for the first time organized is the new county. — *The People* v. *Maguire*, 32 Cal. 140 ; *Buckinghouse* v. *Gregg*, 19 Ind. 401 ; 9 Texas, 336 ; 12 Texas, 395 ; 25 Texas, 29 ; 18 Mo. 566 ; 17 Mo. 576. Where an officer holds under color of right, the office cannot be filled by appointment until the conflicting claims have been determined by judicial proceedings instituted for that purpose. — *Tappan* v. *Gray*, 9 Paige Ch. 507 ; *Stokes* v. *Kirkpatrick*, 1 Metc. 138 ; *The State* v. *Lusk*, 18 Mo. 133 ; *The State* v. *Kent*, 47 Mo. 301 ; 9 Barr, 573 ; 1 Ill. 75 ; 2 N. H. 202.

FARISH & GRIFFIN, for respondent.

HAYDEN, J., delivered the opinion of the court.

This is an information in the nature of a writ of a *quo warranto*, to try the title of respondent to the office of sheriff of the city of St. Louis. The petition charges that by the Constitution of the State of Missouri, and the laws enacted thereunder, it is provided that there shall be elected a sheriff for each county of the State, and also one for the city of St. Louis ; that on January 16, 1877, the respondent usurped and intruded into the office of sheriff for the city, and from then till now has exercised and usurped its functions without legal right, and still does so. The

answer denies the usurpation; admits that at the time alleged the respondent did, and now does, exercise the functions of the office; and sets up that on October 22, 1876, there was, under the Constitution and laws of Missouri, created and established a new county or political subdivision of the State, called the "City of St. Louis;" that on June 6, 1877, the governor of the State of Missouri appointed the respondent sheriff of the city of St. Louis, and that he was thereafter, and before the filing of the petition, duly commissioned and qualified as such. A demurrer to the answer being overruled, a reply was filed, which denies the creation or establishment of a new county or political subdivision of the State, called the "City of St. Louis," or that the city of St. Louis is now, or ever has been, a legal county of the State of Missouri, or that there is any authority in the Constitution or laws of the State for the creation or organization of any county to be known as the "City of St. Louis," so as to entitle the governor to appoint a sheriff for the city of St. Louis, which, the reply avers, is merely a city. The relator then alleges that at the date of the pretended appointment the defendant was not, and is not now, legally qualified for the office of sheriff for the city, in this, that he had not been a citizen of the city for two years previously to his appointment.

At the trial, the burden of proof being upon the respondent, he produced a commission from the lieutenant and acting governor of the State of Missouri, of date June 6, 1877, appointing and commissioning him "sheriff within and for the city of St. Louis, of the State of Missouri," etc., authorizing him to hold the office "until the general election of 1878," and with the commission put in evidence the oath of office, and bond approved by the Circuit Court of St. Louis County. This shifting the burden of proof, the relator offered in evidence a commission of the governor of Missouri to Emile Thomas, of date November 22, 1876, reciting the election of the latter on November 7, 1876, as

sheriff of the county of St. Louis, and commissioning him "for the term of two years, as specified by law," etc., and also the oath of office and bond. The relator then offered in evidence a commission from the governor of Missouri to Emile Thomas, of date November 16, 1874, commissioning him as sheriff for the county of St. Louis for two years, and also his oath of office and bond. These papers the respondent objected to as irrelevant. The relator then gave evidence, with a view to support the allegations of the reply, to the effect that when commissioned the respondent had not been for two years a resident of the city of St. Louis.

The question in this case is not whether the city of St. Louis, as now organized under the Scheme and Charter, is a county in the sense in which that word is used in the Constitution to describe the normal county of the State. It is not such a county. It has not, nor was it intended to have, a County Court, and it has "a chief executive and two houses of legislation." In spite of these and other features which distinguish it from the normal county, it may be a county so far as to keep up a relation as such to the rest of the State. It may be a part of the general county system, and it is so unless the framers of the Constitution intended to segregate it, and to dissever, in the case of St. Louis, that county relation which every other portion of the State bears to the State. Because the organization of this body as a city is pronounced and its features strongly marked, and because they thus reduce its attributes as a county into comparative insignificance, it does not follow that the latter do not exist. That the body has some of the attributes of a county cannot be denied. Under the Constitution it sends representatives to the General Assembly, it collects State revenue, it forms part of the territory over which State officers and the courts of the State have jurisdiction; and it cannot be denied that it is a county in the sense in which that term is used when, if not a definition, at least the nearest approach to a defini-

tion which the Constitution affords is attempted, — " a legal subdivision of the State." Art. 10, sec. 1.

In the 20th section of the 9th article of the Constitution the separation of the city, as proposed to be enlarged, from the rest of the county is provided for. To the city thus enlarged are to be given features not possessed by the old corporation ; while " the residue of St. Louis County " is to be reorganized under a new county government, and is then to constitute, not the old county, but St. Louis County, known as such, consisting of " the residue of St. Louis County." In providing for the separation and the scheme, in this and immediately succeeding sections the framers of the Constitution had occasion to repeatedly designate the two bodies, which, in their view, were to become two new organizations, — one, the " city thus enlarged," and the other, " the residue of St. Louis County." Naturally, these two bodies are referred to as " the city " and " the county." The city was regarded as such, because the object was to make provision for its municipal features properly so called. Until the law-givers reached the middle of the 23d section there had been no occasion to consider the city in its relations to the State. Now, for the first time, a distinct phase of the subject is presented, and the law-giver, bearing in mind that the body has hitherto been treated in its purely municipal character, and has been clothed with attributes which apparently make it something different from a county, after providing that it shall possess two great distinctive features of counties, adds the sweeping words, " and perform all other functions in relation to the State in the same manner as if it were a county as in the Constitution defined." Thus, though the body lacks some of the attributes that attach to the ordinary county ; though, for instance, it possesses no County Court, and the Constitution says " in each county there shall be a County Court ;" yet the words which have been quoted, when considered, as by the rules of construction they must be, in connection with the con-

text, plainly indicate that the framers of the Constitution intended that the "city of St. Louis," though not a county in name, should bear the relations of a county to the State. It shall, says the law-giver, send its representatives to the General Assembly. It shall perform all other functions in relation to the State as if it were a normal county, as if the points of difference which distinguish it from the ordinary county did not exist. If it is to perform these important duties, and "all other functions" of a county, and not only to perform them, but "in the same manner" as other counties, is not this, in effect, saying that it is a county in function, and only not a county in name? Does not the opposite argument imply either that the framers of the Constitution were unable to distinguish between names and things, or that they set more store by the mere appellation than by the substance under it?

Thus, the words of the Constitution, when carefully considered, cannot be pronounced doubtful; but were they of doubtful meaning, the construction for which the relator contends could not be given to them. Anomalies in the political system are not to be arrived at by construction. Unless the words are plain, it cannot be held that the Convention intended to create a political body which should be outside of that county system which prevails, not only in this State, but throughout the country. The researches of the counsel for the relator have not enabled them to find any instance in the United States of a municipal corporation which is not either within some county or which does not itself bear a county relation to the State.

An additional argument, pointing to the same conclusion, arises from the character of the office in question. The office of sheriff is one of the oldest known to the common law. It is inseparably associated with the county. The name itself signifies the keeper of the shire or county. The office is said to have been created by Alfred when he divided England into shires, though Coke claims for it an earlier

origin, and says that it existed during the Roman occupation of England, and that Alfred's division into shires or counties was but a more exact description. Co. Lit., ch. 6, 186 *d*. The sheriff was the immediate officer of the king within the shire ; received his commission from the king, and directly represented the sovereign power of the State. He was the conservator of the peace within the county; had the safe-keeping of the county jail, and commanded the *posse comitatus*, or powers of the county. He served the process of the State, and enforced its execution, which, says Coke, is " the life and fruit of the law." In this country, allowing for the difference of our system, his function has been similar, and his relation to the sovereign power the same. He is the chief executive officer of the State in his county. Under our Constitution the office is a constitutional office, in the sense that it exists not merely by law, but by provisions of the Constitution. Under our laws he obeys the mandate of the State, not only when issued to him by the courts of his county, but executes writs directed to him by the courts of other counties. He is the State officer, whose jurisdiction is ordinarily bounded by his own county. It cannot be held, without words to that effect, that the framers of the Constitution intended to transform such an officer into the servant of a municipal corporation.

Much of the reasoning of the relator implies that the city of St. Louis cannot be a county, because it is a city. But it will readily be admitted that the framers of the Constitution could have made it a city and also have made it a county. That they have not done so must be shown by the provisions of the Constitution, not by arguing that it cannot be a county because it is a city. The fact that a county essentially differs from a city does not prove that a city may not contain the features of a county organization. Cities and counties may be distinct organizations in the State generally, but the Constitution may by special provisions establish a body which shall have the peculiar powers and obli-

gations of a municipal corporation, properly so called, and yet shall bear those relations to the sovereign power which constitute a county. A class of political divisions of the State which should lack some feature usually considered inseparable from counties might be created; it could not be inferred from the lack of such feature that the whole class was intended to be kept outside of the county system. In the 16th and 17th sections of the 9th article the Constitution provides a method by which any city having a population of more than 100,000 inhabitants may frame a charter, through a board of freeholders, for its own government. The provisions of these sections, so far as they extend, bear a general similarity to those under which the Scheme and Charter were framed, and the purpose of the sections is substantially the same. Hereafter many cities may have their own chief magistrates and houses of legislation under these provisions. It certainly cannot be assumed that the intention was to keep them outside of the general county system; yet there are not, as there are in the present case, any express words indicating that they shall be a part of, or within, that system.

The people of the former county of St. Louis having, through a majority of legal voters voting at the election of August 22, 1876, ratified the Scheme, in theory of law it became, sixty days after that date, the organic law of the city and county. In point of fact, peculiar circumstances created a disturbance in the operation of the legal theory, and this disturbance the law recognizes and provides for. It was not, however, the less true that the Scheme and Charter became the organic law, and were the organic law before the general election of November, 1876. The evidence of this fact did not exist, and the election was held upon the supposition that the Scheme had been defeated. Accordingly, at the general election no candidates for the newly-created office of sheriff of the city of St. Louis were proposed or voted for. Candidates were proposed and voted

for for an office which had no existence, — the office of sheriff of St. Louis County. The commission issued to Mr. Thomas might avail to give color to his claim as a *de facto* officer, but there is no question here as to merely *de facto* office and officer. It is here a question between the State and the respondent as to the rights of the officer, not as to the validation of the acts of one who, after his office had in law ceased to exist, but before any organization under the new laws took place; was, by recognition of all, actually doing the duties of a place which, by common consent, was considered in existence. The rules by which validation is given to certain acts done under color of rights rest upon the necessity of keeping up the organization of civil society. When the *de jure* title to an office is in question, such considerations have no application. When the respondent received his commission the county called the "City of St. Louis" had been established and organized, and was, not merely in theory of law, but actually, a county.

Under the 10th section of the 9th article of the Constitution, which provides that there shall be elected by the qualified voters in each county, at the time and place of electing representatives, a sheriff and coroner, there should have been elected a sheriff for the city of St. Louis at the general election in November, 1876. As no sheriff for this new county was elected, owing to the fact that it was not known that the Scheme and Charter had been carried, a vacancy existed, and it became the duty of the governor to appoint. The last clause of the 10th section of the 9th article of the Constitution provided, "Whenever a county shall be hereafter established, the governor shall appoint a sheriff and coroner therein, who shall continue in office until the next general election, and until their successors shall be duly elected and qualified." These words provide in special terms for such a case as this. The words of the next, or 11th, section provide for another and different case, not for the case which has already been provided for in the 10th section.

Within the meaning of the section just quoted from, the city of St. Louis is a county, it being a body which, not by virtue of the ordinary laws, but by special provision of the Constitution, has the functions as well of a county as of a city. The will of the people having so declared, this new political body, with its double functions, came into being on October 22d. It was afterwards organized, and became a county "hereafter established," within the meaning of the section cited. Accordingly, it became the duty of the governor to appoint a sheriff, any provision of the charter to the contrary being in conflict with the Constitution, and inoperative. The respondent received the commission of the governor, and became entitled to the office if possessed of the necessary qualifications.

The qualifications requisite were those necessary for a sheriff for the county known as the " City of St. Louis." We are of the opinion that a two years' previous residence within the limits of the city of St. Louis was not required; and if it were, we think that the relator failed to remove the presumption of eligibility arising from the commission. The permanent residence or domicile of the respondent was established as having been within the city of St. Louis before he went into the country, and he resided in the city at the date of the commission. The general rule of law is that a domicile, once acquired, continues until it is left with an intention not to return, or, at least, without intent to return. When, as in this case, a permanent residence is once established, to establish a different permanent residence two things must concur, the fact of residence and the intention of remaining. The original domicile continues until it is fairly changed for another. 1 Am. Ld. Cas. *747. These are well-settled principles; and tested by these, the case of the relator was not made out. It appears that the respondent, whose domicile was in the city, for a temporary purpose went to the county outside of the present city limits, and in an unsettled way lived there, passing a part of his time in the city and part in the country. On two

occasions he stated, when giving evidence, that he lived in the county; and on one occasion, more than two years before the date of his commission, he voted in the county outside of the city. These acts, at most, denote a temporary residence out of the city, when taken in connection with his other acts, and those of his family. No intention of giving up the domicile which he had is shown. On the contrary, the inference is that he did not intend to abandon the city as a place of residence, and the acts show that he acquired no permanent residence in the country. *Smith v. The People*, 44 Ill. 16.

It appears, therefore, that the respondent is in lawful possession of the office of sheriff for the city of St. Louis, and is entitled to continue to perform its duties under the commission granted to him by the governor of the State. Judgment will be entered for the respondent. All the judges concur.